IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAMERE HASAN TALMADGE,   )
       Petitioner,   )   Civil Action No. 14-102 Erie
               )
       v.   )
               )   Magistrate Judge Susan Paradise Baxter
JOHN KERESTES, et al.,   )
       Respondents.   )

## OPINION AND ORDER[1]

Petitioner, state prisoner Damere Hasan Talmadge, has filed with this Court a petition for a writ of habeas corpus. Respondents have filed a motion to dismiss the petition. [ECF No. 9]. For the reasons set forth below, the motion will be granted and a certificate of appealability will be denied with respect to all claims.

## I.

### A.   Background[2]

In this habeas action, Petitioner is challenging the judgment of sentence imposed upon him on June 1, 2009, by the Court of Common Pleas of Erie County. On that date, the court sentenced him to a term of incarceration of 240-480 months for Murder of the Third Degree followed by a consecutive term of 9-24 months for Endangering the Welfare of a Child. (Petitioner was also convicted of Aggravated Assault and Recklessly Endangering Another Person, but those counts merged for sentencing purposes).

---

[1]     In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a U.S. Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2]     Respondents have filed a hardcopy of the documents contained in the Common Pleas Court's file, which are numbered 1 through 47. These documents shall be cited as "CP Dkt. No. __ ."

1

The victim in this case was an infant, Tah-Meere Johnson Talmadge. In its Rule 1925 Opinion issued following Petitioner's initiation of his direct appeal, the trial court set forth a detailed recitation of the evidence introduced at Petitioner's trial. Although it is very lengthy, it is repeated here to understand the context of Petitioner's claims. (In its Opinion, the trial court refers to him as "Appellant"):

This case involves the tragic murder of Tah-Meere Johnson Talmadge, a three-month old infant (D.O.B. 02/26/08), who died on June 16, 2008 as a result of a catastrophic brain injury inflicted by Appellant. During his brief life, Tah-Meere lived in an extremely tumultuous and violent household, and was the victim of physical abuse on more than one occasion. At the time of his death, Tah-Meere resided at the home of Tonya Williams, his maternal grandmother, with the following persons: Tonya Williams, Tah-Meere's mother, Ciearra Johnson; Appellant; Tonya's two-year old son, TahJai; Tonya's two teenage daughters, who were staying in Chicago at the time; and, Ciearra's four-year old daughter Tanijah, who resided elsewhere but stayed on occasion. (N.T. Trial (Day 2), 03/30/09, at 6, 7, 9).

Tah-Meere's mother, Ciearra Johnson, left the Erie area in October or December of 2006 to live in Philadelphia. In June of 2007, while living in Philadelphia, Ciearra conceived Tah-Meere and subsequently returned to Erie in August of 2007.[3] On or about December 12, 2007, when Ciearra was six months pregnant, Appellant, a Philadelphia resident, arrived at Ciearra's mother's house and began living ... there. Ciearra's mother, Tonya Williams, along with her other family members, never met Appellant prior to this time. While living at Tonya's, Appellant stayed with Ciearra in an upstairs bedroom located above Tonya's kitchen. (N.T. Trial (Day 2), 03/30/09, at 70, 74, 80, 168, 204, 226-227, 229).

[3] At trial, Cierra testified that Appellant was not Tah-Meere's father. In fact, Ciearra testified that she first spoke with Appellant on November 5, 2007 after meeting him on a chat line. She also testified that she first met Appellant on December 12, 2007 when he arrived at her mother's house. However, she stated they agreed to tell everyone that Appellant was the father and they met in Philadelphia. (N.T. Trial (Day 2), 03/30/09, at 224-228; N.T. Trial (Day 3), 03/31/09, at 15).

In January of 2008, relations between Appellant and Ciearra began to deteriorate.[4] Appellant and Ciearra argued on a regular basis, and, on occasion, their fights turned physical. Appellant attempted to choke Ciearra twice while she was pregnant and hit her. Police responded to the home, but never arrested Appellant. (N.T. Trial (Day 2), 03/30/09, at 12-13, 81, 111, 229, 231-232, 235-238).

[4.] Appellant also had a poor relationship with Ciearra's family and refused to give Tonya money for rent and groceries. (N.T. Trial (Day 2), 03/30/09, at 21-22, 163, 253-254, 261).

When Tah-Meere was born, Appellant was named as the father on the child's birth certificate, and he held himself out as same. After the birth, Ciearra, Appellant and Tah-Meere shared an upstairs bedroom and Tah-Meere would sleep in their bed. (N.T. Trial (Day 2), 03/30/09, at 8, 11, 67; N.T. Trial (Day 3), 03/31/09, at 23).

During the first month of Tah-Meere's life, Ciearra was his primary caretaker. Subsequently, Appellant began spending more time alone with the baby. Appellant became jealous of Tah-Meere because Ciearra was spending more time with Tah-Meere than with Appellant. (N.T. Trial (Day 2), 03/30/09, at 107-108, 239-241).

When Tah-Meere was just a few days old, Ciearra's grandmother (Tonya's mother), Bertha Lee Henley, and Bertha's sister, Jerdean Johnson, were at Tonya's house and observed Appellant pick up Tah-Meere by one arm. (N.T. Trial (Day 2), 03/30/09, at 170, 206).

Shortly after Tah-Meere's birth, Appellant and Ciearra began arguing and Appellant became verbally and physically abusive. When Tah-Meere was approximately two-weeks old, Appellant held him up and informed Ciearra, "Keep talking and I'll drop this fucking baby and won't neither one of us have him." In another incident, while Ciearra held Tah-Meere, Appellant threatened to leave and take Tah-Meere to Philadelphia. When Ciearra said "no," Appellant responded he would drop the baby. Appellant called Tah-Meere a problem because he cried too much. During various arguments, Appellant stated he was "tired of playing daddy" and Ciearra should find his real father. Appellant also threatened to return to Philadelphia. (N.T. Trial (Day 2), 03/30/09, at 14, 16, 251, 256-259).

In April 2008, Appellant and Ciearra had a physical fight in her bedroom while Tah-Meere was lying on the bed. Tonya removed Tah-Meere from their bedroom. (N.T. Trial (Day 2), 03/30/09, at 243).

In early May 2008, Appellant choked and threated to kill Ciearra while she held Tah-Meere. Appellant then picked up Tah-Meere by the back of his t-shirt and told her, "I'm about to leave with my son and you can't do anything." Appellant then left the residence and returned back a short time later. Another physical altercation ensued and Appellant pulled on Tah-Meere while Ciearra held him. Ciearra handed Tah-Meere to her aunt, Sherita Davis, and Appellant began ripping up Tah-Meere's snowsuit and throwing baby formula on the ground. Sherita then took Ciearra and Tah-Meere to a shelter. Ciearra stayed only a few hours and returned home. (N.T. (Day 2), 03/30/09, at 244-246; N.T. Trial (Day 3), 03/31/09, at 157-158, 167-172).

Approximately three weeks before his death, Tah-Meere became excessively fussy. According to Ciearra, "fussy like screaming bloody murder type of cry." Despite this, Ciearra did not take Tah-Meere to a doctor. During those last three weeks, Appellant had Tah-Meere in his custody the majority of the time and would leave Tonya's house without informing Ciearra. Id. at 264. (N.T. Trial (Day 2), 03/30/09, at 18, 69, 262, 264); N.T. Trial (Day 3), 03/31/09, at 26).

On the evening of June 13, 2008, Appellant was visibly irritated that he was unable to go to the Waldameer Amusement Park because Ciearra had to purchase diapers and baby items for Tah-Meere. That night, Tah-Meere was crying incessantly and Appellant was frustrated that he would not calm down. Moreover, Appellant had an argument with Ciearra's mother (Tonya) about rent money. Ciearra also spoke with Tonya and Blanca Feliciano about going to a shelter because she was tired of arguing with Appellant and the way he treated Tah-Meere. She also told them that Appellant threatened to drop Tah-Meere. (N.T. Trial (Day 2), 03/30/09, at 22, 267, 271-273; N.T. Trial (Day 3), 03/31/09, at 159).

On Saturday, June 14, 2008, at approximately 10:00 a.m., Appellant left the residence with Kenny Brewton and promised Ciearra he would buy her cigarettes. By 11:00 a.m., Appellant had not returned so Ciearra left the house with Tah-Meere to purchase cigarettes. On the way, she saw Appellant and engaged in an argument outside a store. At that time, Appellant stated, "fuck you and that baby." Afterward, they went to Starsha Brewton's home and watched a movie. At approximately 1:30 or 2:00 p.m., they left and Ciearra took Tah-Meere home. (N.T. Trial (Day 2), 03/30/09, at 36-37, 276, 278, 280-283).

When Ciearra returned home, Tonya, TahJai and Taniyah were present. At around 2:00 p.m., Tonya left with TahJai to use the phone at Bogey's tavern to call her mother, Bertha Henley, for a ride.[7] After 3:00 p.m., Bertha picked up Tonya at the bar and drove them to the store. While shopping, Bertha told Tonya that she had to take Ciearra to a store, Erie County Farms. (N.T. Trial (Day 2), 03/30/09, at 30-31, 33-34, 174-176, 283).

[7] At trial, Tonya testified that she also took Taniyah. Ciearra testified that Taniyah was with her at home when Tonya left to use the phone. She further stated that during the afternoon, Appellant was alone with Tah-Meere and informed her that the baby would not stop whining. (N.T. Trial (Day 2), 03/30/09, at 30-31, 284-287).

At around 4:30 p.m., Bertha drove Tonya home. When they arrived at the house, Appellant was walking down the street. Tonya got out of the car, went inside, and told Ciearra that Bertha was waiting outside. Ciearra, who was feeding Tah-Meere at the time, placed him in his car seat in the living room and propped a bottle in his mouth.[8] Tonya took the bottle out of Tah-Meere's mouth and burped him by pushing on his stomach.[9] (N.T. Trial (Day 2), 03/30/09, at 35-38, 176).

[8] Ciearra testified that after Tah-Meere drank two ounces of milk, she burped him and placed him in the car seat. She then fed him another ounce of milk. (N.T. Trial (Day 2), 03/30/09, at 289-290).

[9] Tonya testified that due to a medical condition, she never held Tah-Meere. (N.T. Trial (Day 2), 03/30/09, at 20).

4

While Bertha was waiting for Ciearra, Appellant approached her car and asked her to forgive him "for jumping on Ciearra." Bertha refused, and Appellant left visibly angry. Appellant briefly spoke with Ciearra outside and asked if she would take Tah-Meere. Ciearra declined. Appellant then went into Tonya's house. (N.T. Trial (Day 2), 03/30/09, at 178-179, 291-292).

While Tah-Meere was sitting in his car seat, Tonya went into her kitchen with Taniyah and TahJai. TahJai ran outside twice and Appellant brought him in the second time. When he entered the house, Appellant, who was visibly upset, told Tonya about an argument with Bertha and stated, "I don't have to take this shit. I'm leaving."[10] Appellant grabbed his duffle bag from [the] front door and ran upstairs. After hearing movement upstairs, Tonya saw Appellant come downstairs with a duffle bag and throw it by the front door. After stepping outside for a few minutes, Appellant re-entered the house and removed Tah-Meere from his car seat by one arm. Upon seeing this, Tonya told Appellant not to pick him up that way, and Appellant responded, "This is my baby. I'll do what the fuck I want to." Appellant then took Tah-Meere upstairs. (N.T. Trial (Day 2), 03/30/09, 40-44)[.]

[10.] At this time, Ciearra and her grandmother had already departed. Id. at 293.

While in the kitchen, Tonya overheard movement and bumping noises and what appeared to be the sound of a car seat being moved around from Appellant's bedroom. After the noise stopped, Appellant ran downstairs and informed her that something was wrong with Tah-Meere. Appellant took Tah-Meere in her [sic] arms and noticed that he was blue and not breathing. Appellant asked her if he should call 911 and she responded, "That's all I need." Tonya then informed him to go to Tammy Logan's house and get help. (Id. at 48-49). Tonya began administering CPR. Id. at 48. (N.T. Trial (Day 2), 03/30/09, 46-49, 102-103).

Ultimately, Tammy Logan arrived at Tonya's house and took Appellant and Tah-Meere to the hospital. On the way, Appellant called 911 and administered CPR to Tah-Meere. While in the car, Appellant told Tammy that he took Tah-Meere upstairs and he started choking while laying on the bed. He further stated that after he picked up Tah-Meere and patted him on the back, laid him back down, … he again started choking. (N.T. Trial (Day 2), 03/30/09, 51, 130-137).

At approximately 5:45 p.m., Tah-Meere arrived at Hamot Medical Center E.R. in cardiac arrest. Tah-Meere was intubated and hospital personnel began CPR. Due to the fact that Hamot did not have a pediatric ICU, it was determined that Tah-Meere would be transferred to Pittsburgh Children's Hospital. (N.T. Trial (Day 3), 03/31/09, at 52-53-55).

Before Tah-Meere was life-flighted to Pittsburgh, E.R. physician Dr. Kenneth Patton ordered a CAT scan, which revealed bleeding in Tah-Meere's head. Dr. Patton also observed blood in Tah-Meere's stool. Hamot's case manager, William Marsh, contacted Childline and Office of Children and Youth and informed them of suspected child abuse.

While at Hamot, Appellant spoke separately with Dr. Patton and Mr. Marsh concerning the occurrence. Appellant informed Dr. Patton that he had just fed Tah-Meere and when he put him down, Appellant heard gurgling noises. Appellant said that he stepped out of the room to inform someone and when he came back, Tah-Meere was not breathing. Appellant informed Mr. Marsh that as he was burping Tah-Meere, the child's arms started flailing so he told the grandmother who performed CPR. (N.T. Trial (Day 3), 03/31/09, at 54-55, 63).

When Ciearra returned home from shopping, Tonya and neighborhood children informed her what happened. Bertha drove them all to the hospital. While in the car, Tonya told Ciearra that Appellant stated he was tired of arguing with her family and that he was taking the baby upstairs to get ready and leave. Tonya further stated that she heard bumping noises and called out for Appellant twice. Seven or ten minutes later, Appellant ran downstairs with the baby. (N.T. Trial (Day 2), 03/03/09, at 54-55, 185-293, 296, 300).

When Ciearra arrived at the hospital, the doctor told her that Tah-Meere's brain was swelling rapidly. She accused Appellant of causing Tah-Meere's injuries. When she asked Appellant what happened, he told her that when he came into the house, he pulled [a] bottle out of Tah-Meere's mouth, picked him up, and burped him. Appellant stated he then took Tah-Meere upstairs and laid him on the bed. While he was looking for clothes, he heard Tah-Meere choking. (N.T. Trial (Day 2), 03/30/09, at 148, 301, 303-304).

At approximately 7:45 p.m., Tammy Logan drove Ciearra and Appellant home. When Tammy asked Appellant what happened, Appellant stated that weeks prior, TahJai hit the baby in the head with an ashtray. (N.T. Trial (Day 2), 03/30/09, at 145).

While at home, Ciearra spoke with a doctor in Pittsburgh and was informed that Tah-Meere was dying. Ciearra then went to Bogey's to get Tonya and at around 2:00 a.m., she called Bertha for a ride to Pittsburgh. On the way to Pittsburgh, Bertha asked Appellant what happened, and he replied, "I didn't do nothing. I didn't hit it, I didn't drop it, I didn't do anything." At around 8:00 a.m., they arrived in Pittsburgh and Appellant subsequently told Ciearra that Tah-Meere started choking while sitting in a swing. Id. (N.T. Trial (Day 2), 03/30/09, at 188-190, 210-211, 305-306, 309).

Tah-Meere was life-flighted to Children's Hospital in Pittsburgh. When he arrived, Dr. Rachel Berger was contacted to evaluate him.[13] After reviewing the CT scan and report from Hamot Hospital, Dr. Berger spoke with Appellant and Ciearra in order to obtain a history.[14] Dr. Berger concluded that there was no explanation they could give her, other than a massive motor vehicle crash, to make her think their story was true. (N.T. Trial (Day 3), 03/31/09, at 70, 81).

[13.] Dr. Berger is board certified in pediatrics. She is part of a team at the Child Advocacy Center at Children's Hospital that evaluates children who are victims of suspected abuse and neglect. (N.T. Trial (Day 3), 03/31/09, at 70).

During the history, Appellant informed her that he went upstairs to get Tah-Meere and observed that Tah-Meere was limp and making unusual sounds. During their conversation, Dr. Berger had a difficult time obtaining a history from both parents and at one point, Appellant and Ciearra began arguing about Tah-Meere vomiting blood two weeks prior to the incident. They said Tah-Meere had a history of reflux. (N.T. Trial (Day 3), 03/31/09, at 77-78, 80).

Dr. Berger then evaluated Tah-Meere. She found that he was severely underweight and did not respond to touch or pain. Dr. Berger and an ophthalmologist also observed retinal hemorrhages that extended to the edge of the eye. Tah-Meere had blood in more than one layer of the retina, which Dr. Berger concluded was caused by a shaking-type injury. She further noted that these injuries do not occur, with the possible exception of a child dying from leukemia, other than from shaken baby or inflicted brain injury. Dr. Berger concluded that this was an "unbelievably violent act" and Tah-Meere was symptomatic immediately and unconscious soon afterwards. She further concluded that Tah-Meere was unable to eat after the injury. The CT revealed massive cerebral edema and massive brain swelling, incompatible with life. (N.T. Trial (Day 3), 03/31/09, at 82-86, at 82-86, 90).

On June 15, 2008, at around 4:00 p.m., Erie Police Department Detectives Spagel and Peters arrived in Pittsburgh and spoke with Appellant. Appellant told them he took Tah-Meere upstairs, began to dress him, and then put him on the bed. Appellant stated that when he turned around, he heard Tah-Meere gurgling and choking. Appellant further noted that he picked up Tah-Meere, patted him on his back, and noticed that he was turning colors. At no time did Appellant indicate he was feeding Tah-Meere. Appellant further stated that Tah-Meere was fine before the incident and that he did not shake or hurt Tah-Meere. After speaking with Appellant, Detective Spagel informed both Ciearra and Appellant not to go anywhere without informing him. Id. at 186. (N.T. Trial (Day 3), 03/31/09, at 184-186).

On June 16, 2008, Tah-Meere died. Following his death, a postmortem skeletal survey was conducted. The survey showed several old injuries, including rib posterior fractures, a healing clavicle fracture, and healing femur fracture.[15] Dr. Berger concluded that Tah-Meere was a victim of violent shaking, i.e., Shaken Baby Syndrome, and had been the victim of child abuse on more than one occasion. She found that Tah-Meere died from acute inflicted traumatic brain injury and that he was symptomatic and unconscious immediately after this event occurred. (N.T. Trial (Day 3), 03/31/09, at 86-87, 92, 100).

[15] At trial, Dr. Berger testified that posterior rib fractures were indicative of child abuse. (N.T. Trial (Day 3), 03/31/09, at 86).

On June 17, 2008, Dr. Todd Luckasevic, a forensic pathologist with the Allegheny County Medical Examiner's Office, performed an autopsy on Tah-Meere. Dr. Luckasevic found that he suffered acute, non-accidental blunt force trauma to the head and acute, blunt force trauma to the trunk consistent with violent shaking/grabbing. He also found that Tah-Meere sustained paraspinal muscle hemorrhage and cervical cord,

thoracic cord and lumber spinal cord hemorrhage. Dr. Luckasevic concluded that Tah-Meere was a victim of Shaken Impact Syndrome because of the impact site and brain and eye problems. He further concluded that these were catastrophic injuries and Tah-Meere would have been symptomatic immediately. (N.T. Trial (Day 3), 03/31/09, at 119, 123-126, 129-130, 150).[16]

> [16] At trial, Appellant's expert pathologist, Dr. James Smith, testified that Tah-Meere received a blow to the head and disagreed with the autopsy report that Tah-Meere was immediately unconscious. Dr. Smith stated that whether Tah-Meere was immediately unconscious could not be detected from an autopsy. Moreover, he concluded that Tah-Meere could have had a lucid interval and, additionally, had more time prior to becoming unconscious. On rebuttal, Dr. Eric Vey, a forensic pathologist, stated that Tah-Meere died of injuries associated with Shaken Baby Syndrome and would NOT have had a lucid interval. (N.T. Trial (Day 5), 04/02/09, at 19-22, 50, 52).

Dr. Luckasevic also found old trauma and dated them by looking at the fracture for callus formation bone healing. He found the following: 1) fracture callus of the left 3rd rib laterally and 10th rib posteriorly that were two or three weeks old; 2) fracture callus of the bilateral clavicles and they were one or two weeks old; 3) fracture callus of the right 9th rib posteriorly and two of the right 10th rib posteriorly and those were two to three weeks old; 4) fracture callus of the right 11th rib laterally that was less than five days old; 5) callus formation of the left proximal femur that was two to four weeks old. He concluded that these old injuries were non-accidental. (N.T. Trial (Day 3), 03/31/09, at 127-129). (This evidence directly related to the endangering welfare charge).

On June 17, 2008, Ciearra called Tonya and informed her that she and Appellant were returning to Erie. Tonya told Ciearra that Appellant was not welcome in her home. At this time, Ciearra stated that she would not be returning. Approximately 5 minutes after the conversation, Tonya called Detective Holmes and informed him that Appellant and Ciearra were headed to Philadelphia. Based on this information, police decided to charge Appellant. While at the bus station in Pittsburgh, Pennsylvania State Police arrested Appellant. (N.T. Trial (Day 2), 03/30/09, at 65-66, 311-313); (N.T. Trial (Day 3), 03/31/09, at 187-188).

Detective Spagel subsequently picked up Appellant in Pittsburgh and drove him back to Erie. The next day, during a videotaped statement, Appellant gave several different explanations of Tah-Meere's death. After receiving information from the Allegheny County Coroner's, police drafted a new arrest warrant, including a general count of homicide. (N.T. Trial (Day 3), 03/31/09, at 188-189, 190-93).

- - -

On March 27, 2009, Appellant's jury trial commenced. After the Commonwealth's case-in-chief, Appellant moved for judgment of acquittal on all four counts. The Court denied Appellant's request, but struck portions of Count 4 (endangering welfare of

children) regarding the Commonwealth's assertion that Appellant caused Tah-Meere's old injuries to his ribs, clavicles, and femur. On April 2, 2009, following a five day trial, Appellant was found guilty of [Count 1, Murder of the Third Degree; Count 2, Aggravated Assault; Count 3, Recklessly Endangering Another Person; and, Count 4, Endangering Welfare of Children].

(CP Dkt. No. 31 at 1-14 (additional footnotes omitted)).

John J. Mead, Esquire, was Petitioner's defense counsel at trial. Petitioner, through Assistant Public Defender Tina M. Fryling, Esquire, filed a direct appeal of his judgment of sentence, in which the following three claims were raised:

1. Did the trial court err in failing to sever the offenses in this case?

2. Did the trial court err in allowing the jury to hear evidence regarding the unrelated, non-fatal injuries of the child, as the jury's consideration of that evidence was unfairly prejudicial to Appellant?

3. Did the trial court err in failing to grant a mistrial because the Commonwealth did not provide Appellant with a critical medical report regarding the age of the prior injuries to the child?

(CP Dkt. No. 33, Commonwealth v. Talmadge, No. 1024 WDA 2009, slip op. at 2 (Pa.Super. May 24, 2009) (quoting Appellant's Brief at 1)).

On May 24, 2010, the Superior Court of Pennsylvania issued a Memorandum in which it denied Petitioner's claims on the merits and affirmed his judgment of sentence. (Id. at 1-3. See also CP Dkt. No. 31). The Supreme Court of Pennsylvania denied a petition for allowance of appeal on January 13, 2011. (CP Dkt. No. 32).

On or around December 16, 2011, Petitioner filed a *pro se* petition for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* (CP Dkt. No. 34). In this *pro se* filing, Petitioner claimed that the verdict was against the weight of the evidence. He also raised a claim that challenged the veracity of Tonya Williams' and Bertha Lee Henley's trial testimony. He contended that Tonya Williams was "the most likely perpetrator of [the] crime" and that she "gave

false testimony to protect herself" and that her mother, Bertha, "gave false testimony to protect her."

Petitioner also asserted that Ciearra Johnson had sent letters to his grandmother that would support his

claim that he is innocent and that Tonya Williams is responsible for the injuries sustained by Tah-Meere.

Finally, Petitioner made the general allegation that he received ineffective assistance of counsel, but he

did not provide any other details to support that allegation. (CP Dkt. No. 34 at 3).

The PCRA court appointed William Hathaway, Esquire, to represent Petitioner. He subsequently

filed a "No Merit" letter pursuant to Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988) and

Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988) and a petition for leave to withdraw as

counsel. In support of these filings, Hathaway stated that he determined that Petitioner failed to state a

colorable claim for PCRA relief. (CP Dkt. No. 36). Regarding Ciearra Johnson's alleged letters that

Petitioner referenced in his PCRA motion, Hathaway explained:

> The Petitioner further asserts that he had become aware of new evidence that could have
> changed the outcome of the trial. This averment is made in reference to certain letters
> from Ciearra Johnson to the Petitioner's grandmother.... [C]ounsel has directed the
> Petitioner to provide a proffer in support of this claim and to provide the actual letters
> referenced or copies thereof with a further development of this claim for purposes of this
> proceeding. However, the Petitioner has failed to tender any proffer or provide the actual
> correspondence for purposes of review or consideration by counsel. Therefore, I must
> conclude that this claim has been waived by Petitioner.

(CP Dkt. No. 36 at 5).

The PCRA court granted Hathaway's petition to withdraw. It also issued an Opinion and Notice,

in which it informed Petitioner that it found that he failed to establish that he was entitled to PCRA

relief. In its Opinion, the PCRA court first explained why Petitioner's claim that the verdict was against

the weight of the evidence had no merit:

> Petitioner's claim that the verdict was against the weight of the evidence is not
> cognizable under the PCRA. 42 Pa.C.S.A. § 9543. Moreover, this claim was waived.
> 42 Pa.C.S.A. § 9544(b). Assuming Petitioner has raised a cognizable ineffectiveness
> claim, it is meritless.

The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

Commonwealth v. Champney, 832 A.2d 403, 408 (Pa. 2003) (citations omitted).

At trial, the Commonwealth presented evidence, including Petitioner's statement to police, that at the time Tah-Meere went into distress, Petitioner was alone with the baby. Dr. Rachel Berger testified that Tah-Meere died from acute inflicted traumatic brain injury and that he was symptomatic and unconscious immediately after the incident occurred. Dr. Todd Luckasevic, a forensic pathologist with the Allegheny County Medical Examiner's Officer, likewise concluded that these were catastrophic injuries and Tah-Meere would have been symptomatic immediately.

Other witnesses testified as to Petitioner's volatile temper and his rough treatment of the child. N.T. Trial (Day 2), 03/30/09, at 16, 43-44, 170-206, 257.

The jury, after considering and weighing all the evidence, was free to believe the testimony of the Commonwealth witnesses and its evidence over that of Petitioner's. It is obvious that the jury chose not to accept Petitioner's defense theory. Furthermore, as the trial judge, this Court concludes unequivocally that the verdict was supported by both the direct and circumstantial evidence and was not "so contrary to the evidence as to shock one's sense of justice." Champney, at 408. Therefore, trial counsel had no reasonable basis upon which to predicate a weight claim and there is no showing of prejudice.

(CP Dkt. No. 37 at 5-6). With respect to Petitioner's contention that he was denied a fair trial because

Tonya Williams and Bertha Lee Henley gave false testimony, the PCRA court held:

This claim, which is directed at the veracity of the Commonwealth's trial witnesses, is not cognizable under the PCRA. 42 Pa.C.S.A. § 9543. Moreover, to the extent that this is a challenge to the sufficiency of the evidence, the claim was waived. 42 Pa.C.S.A. § 9544(b).

To the extent that Petitioner implies that trial counsel [Mead] was ineffective for failing to challenge the Commonwealth's case or by failing to effectively cross-examine or impeach Williams or Henley, those claims are meritless.

In an attempt to rebut the Commonwealth case, trial counsel presented the expert testimony of Dr. James Smith to support the defense theory that Tah-Meere's injuries

were inflicted at an earlier time when he was not in Petitioner's care. Counsel presented this evidence to suggest that other individuals, including Williams, might have inflicted Tah-Meere's injuries.

Trial counsel also attempted to impeach Williams with several pieces of evidence. He established that: (1) she lied during her June 15, 2008 statement to police when she denied that multiple persons resided in her home; (2) she did not want to call 911 upon learning of Tah-Meere's distress; (3) she was able to lift chairs at Bogey's Bar (where she worked in exchange for drinks), despite her earlier testimony that she was physically unable to hold Tah-Meere; (4) in spite of her earlier denials, she consumed alcohol on the date [of the] incident; and, (5) at some time on the date of the incident, Williams and Ciearra Johnson were alone with Tah-Meere.

Upon review, this Court finds that Petitioner has failed to establish that either Tonya Williams or Bertha Lee Henley gave perjured testimony. Moreover, trial counsel extensively cross-examined both witnesses and presented other evidence in an attempt to refute the Commonwealth's case. Nevertheless, it was the jury's prerogative to accept or reject that evidence and the fact that it rejected Petitioner's defense is not a ground for PCRA relief. Accordingly, Petitioner's claims are meritless.

Petitioner further claims he recently became aware of after discovered evidence. However, Petitioner does not specifically identify the evidence.

After-discovered evidence is the basis for a new trial when it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely for impeaching the credibility of a witness; and 4) is of such nature and character that a new verdict will likely result if a new trial is granted. Further, the proposed new evidence must be "producible and admissible."

Commonwealth v. Chamberlain, 30 A.3d 381, 414 (Pa. 2011) (internal citations omitted).

To the extent that Petitioner is referring to purported letters from Ciearra Johnson to Petitioner's grandmother, he failed to provide the letters or a proffer of their content to PCRA counsel when counsel requested them. (See, PCRA counsel letter, 02/01/12 at unnumbered 5). In brief, the purported evidence is not producible and admissible. Chamberlain, Id. Accordingly, this claim is nothing more than an undeveloped assertion that does not merit consideration.

(Id. at 7-8).

The PCRA court advised Petitioner that he had 20 days to file a response to show why his PCRA motion should not be dismissed for the reasons set forth in the Opinion. (Id. at 10). Petitioner requested,

and received, an extension of time to file a response. (CP Dkt. No. 38). When he did submit his response, he made general complaints about Hathaway's failure to develop his claims. (CP Dkt. No. 40). On March 27, 2012, the PCRA court issued its final order dismissing Petitioner's PCRA claims for the reasons set forth in its previous Opinion. (CP Dkt. No. 41).

Petitioner filed a *pro se* appeal. He listed his claims as:

1. Whether Post-Conviction Counsel [Hathaway] was ineffective for failing to properly investigate and develop the claims presented before filing a no-merit letter?

2. Whether the PCRA court erred in accepting Post-Conviction Counsel's no-merit letter where the record demonstrated that Post-Conviction Counsel failed to properly investigate and develop the claims presented.

(Dkt. No. 44 at 3).

On May 28, 2013, the Superior Court issued a Memorandum in which it affirmed the PCRA court's decision. It held:

> In the argument section of his brief, Appellant does not separate his allegations as he did in his statement of questions presented. Rather, Appellant focuses his attack on one issue: Ciearra Johnson, the mother of the victim, allegedly wrote letters recanting her testimony, accusing her mother of the murder, and exonerating Appellant. Appellant's Brief at 15-16. It is [PCRA] counsel's alleged failure to investigate these letters, which Appellant claims are after discovered evidence, that forms the basis of Appellant's claims of ineffective assistance of counsel.
>
> We discern no error in the PCRA court dismissing Appellant's petition....
>
> Upon review, we agree with the PCRA court's conclusion. Appellant has failed to produce copies of the letters or provide any evidence of their existence. As this alleged evidence is neither producible nor admissible, it cannot serve as the basis for Appellant's claims of ineffective assistance of counsel or after-discovered evidence. Chamberlain, 30 A.3d at 414. Accordingly, as there is not a scintilla of evidence that these letters exist, we conclude that there was no error in the PCRA court's decision, and we affirm the order denying Appellant's petition for relief.

(CP Dkt. No. 45, Commonwealth v. Talmadge, No. 674 WDA 2012, slip op. at 5-6 (Pa.Super. May 28, 2013)). On December 3, 2013, the Pennsylvania Supreme Court denied a petition for allowance of appeal. (CP Dkt. No. 46).

13

Having had no success obtaining relief from his judgment of sentence in state court, Petitioner now seeks a writ of habeas corpus from this Court. This action is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"). Under this statute, habeas relief is only available on the grounds that Petitioner's judgment of sentence was obtained in violation of his federal constitutional rights. 28 U.S.C. § 2254(a). Errors of state law are not cognizable. Id.; see, e.g., Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). See also Real v. Shannon, 600 F.3d 302, 309-10 (3d Cir. 2010).

Petitioner raises the following four claims for relief, which the Court will set forth verbatim:

**Claim One:** Petitioner was denied Due Process of law [ ] 6th Amendment of U.S. Constitution when trial counsel failed to object to the prejudicial remarks made by the D.A. Petitioner's counsel failed to object to matters that were not supported ...when the D.A. claimed that the form of abuse was to "drag [the victim]" and "to throw his lifeless body down like a piece of garbage." (N.T. 4/2/09). This was not indicated by the doctors, their medical report, nor expressed by any witnesses. If trial counsel was in pursuit of effective representation an objection would have been made. The accused shall enjoy the right to effective assistance of counsel both at trial and on appeal.

**Claim Two:** Petitioner was denied due process of law when the judge gave a particular and improper instruction to the jury (violating the 14th Amendment of the U.S. Const.) to reach a verdict on 3rd degree murder[.]... The unconstitutional understanding of the jury instruction was accepted by the jury when the judge stated, "you ... have 4 choices ... one would be not guilty, second ... would be guilty of murder 1st degree, another option is guilty of murder of the 3rd degree, and the 4th would be guilty of involuntary manslaughter." Ironically, petitioner was never given notice of the charges of 1st degree murder and therefore [that] should not been considered by the jury.

**Claim Three:** Petitioner was denied Due Process of Law when [PCRA counsel, Attorney Hathaway] failed to investigate and interview for newly discovered evidence. Petitioner was denied Due Process of Law when appellate counsel failed to investigate and interview a witness for newly discovered evidence when a witness would offer an affidavit based on their perjured trial testimony and information that someone other than Petitioner committed the crime.

**Claim Four:** Constitutional errors that occurred at trial: (1) the Commonwealth failed to establish a prima facie case to all the charges because no evidence existed of record that defendant committed any of the acts charged or was responsible for any of his child's injuries including murder; (2) The Commonwealth court [sic] allowed the jury to accept evidence of prior injuries that did not contribute to the cause of death and as if petitioner was sole guardian that resided in his son's family residence.

[ECF No. 5 at 5, 7, 8, & 10].

Respondents have filed a motion to dismiss. [ECF No. 9]. They contend that Claims 1, 2, and at least part of Claim 4 should be dismissed because Petitioner did not exhaust them, and to the extent that Claims 3 and any part of Claim 4 can be considered exhausted, they do not entitle Petitioner to relief. Petitioner has filed a Reply [ECF No. 16]. He does not contest that he failed to exhaust Claims 1 or 2 and makes no argument to show why they should not be dismissed. The only claims that he addresses are Claims 3 and 4. He urges the court to consider them both on the merits.

**B.    Discussion**

**Claims 1 and 2**

A federal habeas court may not grant a state prisoner's petition for a writ of habeas corpus unless he has first presented his federal constitutional claims to the state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman, 501 U.S. at 731. See also O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999).

> [It is] principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-491, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973). Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution." Ex parte Royall, 117 U.S. [241, 251, 6 S.Ct. 734, 740 (1886)]. Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes

properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). See Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

Rose v. Lundy, 455 U.S. 509, 517 (1982) (footnote omitted).

Importantly, in order to exhaust a claim, "state prisoners must give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's *established appellate review process*." O'Sullivan, 526 U.S. at 844-45 (emphasis added). In Pennsylvania, this requirement means that a petitioner in a non-capital case *must have presented every federal constitutional claim raised in his habeas petition to the Superior Court either on direct or PCRA appeal*. See, e.g., Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

Petitioner carries the burden of proving exhaustion of all available state remedies, see, e.g., Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). He has not met that burden. In fact, in his Reply, Petitioner does not contest Respondents' argument that he did not exhaust Claims 1 and 2 and that, therefore, they should be dismissed. His concession is a wise one, because Claims 1 and 2 clearly are procedurally defaulted because he failed to exhaust them. See, e.g., Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000); Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). Like the exhaustion doctrine, the doctrine of procedural default is "grounded in concerns of comity and federalism," Coleman, 501 U.S. at 730, and it bars federal habeas review of a claim whenever the petitioner failed to raise it in compliance with a state's procedural rules. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines, 208 F.3d at 162-69.

Based upon all of the forgoing, Claims 1 and 2 are dismissed with prejudice.

**Claim 3**

In Claim 3, Petitioner contends that Attorney Hathaway was ineffective for failing to investigate the alleged "newly discovered evidence" regarding Ciearra Johnson's letters. Petitioner did not have a federal constitutional right to counsel during his PCRA proceeding, Pennsylvania v. Finley, 481 U.S. 551, 555 (1987), and, for that reason, cannot receive habeas relief on his claim that his PCRA counsel was ineffective. See also Coleman v. Thompson, 501 U.S. 722, 752-53 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.... Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. See Wainwright v. Torna, 455 U.S. 586 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance.)"). In fact, the federal habeas statute expressly states that a claim of collateral counsel's ineffectiveness is not cognizable in a federal habeas action. 28 U.S.C. § 2254(i) ("[t]he ineffectiveness of counsel during Federal or State collateral post-conviction proceedings shall not be ground for relief in a proceeding arising under section 2254.").

It is worth pointing out, however, that since Hathaway filed a Finley/Turner no merit letter and was permitted to withdraw as Petitioner's counsel, Petitioner proceeded *pro se* in his PCRA proceeding and he cannot blame Attorney Hathaway for his lack of success on any of his claims. As the Superior Court noted, it was Petitioner himself who was not able to produce "a scintilla of evidence" to support them.

Based upon all of the foregoing, Claim 3 is dismissed with prejudice.

**Claim 4**

On direct appeal, Petitioner contended that the trial court erred in permitting the jury to consider the prior injuries of Tah-Meere. In its 1925 Opinion, the trial court stated that that claim should be denied because:

> [E]vidence of Tah-Meere's pre-existing injuries was clearly admissible to show the history of the case. Moreover, at trial, this evidence was not admitted to prove Appellant caused the injuries, but was directly probative of Appellant's knowledge of those injuries and his failure to seek medical care for Tah-Meere. The probative value of this evidence was not outweighed by the danger of unfair prejudice.

(CP Dkt. No. 31 at 18-19). The Superior Court adopted the trial court's reasoning in full when it affirmed Petitioner's judgment of sentence. (CP Dkt. No. 33, <u>Talmadge</u>, No. 1024 WDA 2009, slip op. at 3). To the extent that Petitioner is raising the same claim in this proceeding, it is dismissed because it raises a purely state law issue, which is not cognizable in federal habeas. 28 U.S.C. § 2254(a); <u>see</u>, <u>e.g.</u>, <u>Estelle</u>, 502 U.S. 67-68.

Petitioner's remaining allegation is that the Commonwealth "failed to establish a prima facie case to all the charges." To the extent that Petitioner is contending that the evidence was against the weight of the evidence, such a claim is not cognizable in federal habeas because it too raises solely an issue of state law. <u>Tibbs v. Florida</u>, 457 U.S. 31, 37-45 (1982) (weight of evidence claims raise questions of credibility; it is different from a claim that the evidence was insufficient to support the conviction); <u>see also</u> <u>Young v. Kemp</u>, 760 F.2d 1097, 1105 (11th Cir. 1985) ("A federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence[.]").

If, in fact, Petitioner is raising a claim challenging the sufficiency of the evidence, that claim also is dismissed. The PCRA court held that to the extent that his allegation that Tonya Williams was the actual perpetrator of the crimes encompassed an insufficiency of the evidence claim, that claim was

18

waived because he did not raise it on direct appeal. (CP Dkt. No. 37 at 7). In his PCRA appeal,

Petitioner argued in his brief to the Superior Court that there was insufficient evidence to support the

jury's verdict because Tonya Williams was the actual perpetrator. This point was argued by Petitioner

within his general argument that Hathaway was ineffective as PCRA counsel. As set forth above, a

claim that Hathaway was ineffective is not cognizable in a federal habeas proceeding. Additionally,

Petitioner's contention that there was insufficient evidence to support the jury's verdict is centered upon

his contention that there was "new evidence" that Tonya Williams was the perpetrator of the crimes for

which Petitioner was convicted. Once again, the Superior Court held that Petitioner did not present a

"scintilla of evidence" to support Petitioner's factual assertions regarding the existence of purported new

evidence.

   Based upon all of the forgoing, Claim 4 is dismissed with prejudice.


## C.  Certificate of Appealability

   Section 102 of AEDPA, which is codified at 28 U.S.C. § 2253, governs the issuance of a

certificate of appealability for appellate review of a district court's disposition of a habeas petition. It

provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial

showing of the denial of a constitutional right." "When the district court denies a habeas petition on

procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of

appealability] should issue when the prisoner shows, at least, that jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists

of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v.

McDaniel, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its

merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." Id. Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be dismissed with prejudice. Accordingly, a certificate of appealability is denied.


## II.

For the reasons set forth above, Respondents' motion to dismiss [ECF No. 9] is granted, all of Petitioner's claims are dismissed with prejudice, and a certificate of appealability is denied on all claims.

An appropriate Order follows.


/s/ Susan Paradise Baxter

Dated: December 23, 2014          SUSAN PARADISE BAXTER
                                  United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAMERE HASAN TALMADGE,          )
                    Petitioner,          )          Civil Action No. 14-102 Erie
                                                )
          v.                                   )
                                                )          Magistrate Judge Susan Paradise Baxter
JOHN KERESTES, et al.,                )
                    Respondents.          )

**<u>ORDER</u>**

AND NOW**,** this 23rd day of December, 2014, for the reasons set forth in the memorandum opinion filed contemporaneously herewith, IT IS HEREBY ORDERED Respondents' motion to dismiss [ECF No. 9] is GRANTED. Petitioner's claims are DISMISSED with prejudice and a certificate of appealability is DENIED.

The Clerk of Court is directed to close this case.


/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge